**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**JOEL QUINONES,**                                          **CASE NO.**

    **Plaintiff,**

**v.**

**ROBERT WILKIE in his official Capacity**
**as SECRETARY, VETERANS AFFAIRS,**

    **Defendant.**
_____/

## COMPLAINT

Plaintiff, JOEL QUINONES, hereby sues Defendant, ROBERT WILKIE in his official Capacity as SECRETARY, VETERANS AFFAIRS, and alleges:

## JURISDICTION

1. This is an action brought under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq., and under the Rehabilitation Act, 29 U.S.C. §794, et seq.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights claim jurisdiction).

3. This is an action involving claims which are, individually, in excess of Seventy- Five Thousand Dollars.

## THE PARTIES

4. At all times pertinent hereto, Plaintiff, JOEL QUINONES, has been a resident of the State of Florida and employed by Defendant. Plaintiff is a member of a protected class because of his ethnicity/ race/national origin (Hispanic/ Latino), and disability (history of drug dependance) and because he reported unlawful employment practices and has been retaliated against thereafter. Plaintiff is a resident of the United States.

5. At all times pertinent hereto, Defendant ROBERT WILKIE in his official Capacity as SECRETARY, VETERANS AFFAIRS, has been organized and existing under the laws of the United States and operated the Gulf Coast Veterans Health Care System, Veterans Administration Hospital ("HOSPITAL" or "Defendant"). At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant is Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

6. Plaintiff has satisfied all conditions precedent to bringing this action. This case is timely filed thereafter.

## STATEMENT OF THE ULTIMATE FACTS

7. Plaintiff Dr. JOEL QUINONES, a Hispanic/ Latino, Puerto Rican man with an actual or perceived disability and/or record of impairment, began his

employment with Defendant on August 10, 2017 and, at all times pertinent to this action, was hired to work as a Physician at Defendant's HOSPITAL in Biloxi, Mississippi until his unlawful termination/ revocation of hire on February 12, 2018.

8. Defendant was aware of Plaintiff's Hispanic/Latin ethnicity/national origin as he listed his ethnic origins on his application, had employees who emailed and spoke about his ethnicity to Plaintiff, and because Defendant had to interact with Puerto Rican licensing authorities in order to verify Plaintiff's credentials. Plaintiff even forwarded Defendant an e-mail he wrote in Spanish to the Puerto Rican licensing authority asking them to send his information to Credentialing Officer ("CO") Dominic Duplichien. From the start of the process, Duplichien remarked about always having trouble from Puerto Rico.

9. Plaintiff is a Dual Board-Certified Physician licensed by multiple state boards and Puerto Rico with no malpractice issues on his record.

10. Despite Plaintiff's best efforts, stellar record and recommendations, and attempts to cooperate with Defendant, Plaintiff has been subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of his ethnicity/race/national origin (Hispanic/ Latino) and disability (history of overcoming drug dependance). Further, he has been retaliated against because he reported discrimination.

11. Plaintiff was treated less favorably than non-Hispanic/ Latino employees and those whom Defendant perceived as disabled or having a record of impairment. Defendants employees, CO Dominic Duplichien in particular, were not well suited to obtain information from Puerto Rico and treated applicants from there with more hostility due to the difficulty in obtaining records.

12. The disparate treatment and retaliation came at the hands of specifically but not limited to Associate Chief of Staff for Primary Care ("Ass. Chief of Staff") Dr. Nicholas Masozera, Acting Medical Chief Director ("Acting MCD") Christopher Salso, Chief of Quality Management overseeing credentialing ("CQM") Kelly Woods, CO Duplichien, Interim Medical Center Director Dr. M. Christopher Saslo and others.

13. In August of 2017, Defendant interviewed Plaintiff for the position of Primary Care Physician at Defendant's HOSPITAL.

14. On August 10, 2017, Defendant selected Plaintiff as a candidate, offered him the job, and notified him to begin the credentialling process for the job through an e-mail from Dr. Robert Mishra.

15. Based on Defendant's promises of future employment, Plaintiff permanently relocated, turned down multiple job offers, and left his schedule open to accommodate Defendant.

16. On December 20, 2017, Plaintiff was set up with a login and password for Vetpro, where he was instructed to submit documentation, which he did.

17. Plaintiff did everything he was instructed to do, provided all the documents and information asked of him, but that was not enough for Defendant.

18. Defendant had difficulty obtaining information on Plaintiff's licensure in Puerto Rico, as evidenced by the tone of Defendant's e-mail to Plaintiff "I have CC'ed you on the emails I sent to the PR licensing people. After 23 phone calls, multiple messages and transfers I was able to speak to someone who was kind enough to provide the license # 12777."

19. This is when Defendant's onboarding process began to seriously deteriorate.

20. By the end of the first week of January 2018, Plaintiff was still not working, he wrote Defendant to complain of its pace and see if there was anything, he could do to speed up the process. He reminded Defendant of the fact that he had relied on Defendant's promises of employment in moving, turning down other offers, and clearing his schedule and has not seen any progress.

21. On January 10, 2018, Defendant finally obtained the paperwork from Puerto Rico and began Plaintiff's credentialling process.

22. While credentialling Plaintiff, Defendant found a record of Plaintiff from his active duty service in the Marine Corps Air Station Iwakuni, Japan in 1999.

The record listed that, due to a drug dependency, Plaintiff's clinical privileges were suspended for six (6) months and his privileges to independently prescribe or administer narcotics were suspended for five (5) years.

23. It should first be noted that this was only in Plaintiff's record because he agreed to waive his right to a Board of Inquiry ("BOI") for the discharge, which could have invalidated the report due to his documented diagnosis of addiction. Plaintiff was diagnosed with prescription opioid dependence in 1997. Thereafter, he sought treatment for his addiction in 1997 and has not had a relapse since that time.

24. As a result of his addiction and family issues, Plaintiff accepted an Other Than Honorable "OTH" discharge to be separated from the Navy which would allow him to return home.

25. He took the OTH discharge in order to be reunited with his family and waived his right to fight the charge which was clearly based on his disability.

26. Drug addiction and dependency is a serious medical condition which affects millions of Americans annually and is a recognized Disability. Plaintiff admits that he has a record of dependency and a record of overcoming it. Drug dependency is a condition which would substantially limit one's major life activities depending on the specific factual circumstances.

27. It is also important to note that according to Defendant's own report, this incident had no impact on Plaintiff's licenses, Plaintiff has had no further issues

on his official record in the last twenty-one (21) years he has been practicing, and has never had any malpractice charges or cases against him.

28. Upon receipt of this information, CQM Dr. Kelly Woods, immediately responded, "Quite concerning." However, Dr. Robert Mishra stood up for Plaintiff after receiving Plaintiff's detailed account of the events, urging that Defendant approve the hire, verify the credentials, and bring Plaintiff to the committee. Dr. Mishra, also noted that he "believe[d] that this individual is a very low risk hire and he would be a be an asset to our health care system." (emphasis provided in original e-mail).

29. This smoothed things over briefly, but Defendant continued to have troubles with Plaintiff's Puerto Rican licensure documents being in Spanish and not being able to translate them.

30. CO Duplichien apparently mistakenly believed the certificate stated that Plaintiff's license was invalid due to failure to turn in his Continuing Education Units. This was incorrect, false, and a gross misinterpretation of Plaintiff's good standing.

31. Dr. Mishra came to the rescue again and had his Spanish Nurse Lucy Martin translate the certificate. Dr. Mishra then notified Defendant that the certificate said it was not active because of non-renewal, not failure to comply or discipline and that Plaintiff had notified Dr. Mishra that he allowed the license to

expire because he was moving to Florida and no longer required a Puerto Rico license.

32. The issues of Spanish communication and translation, getting Plaintiff's Puerto Rican documents, and finding his military record from over twenty years prior about his disabling condition prompted Ass. Chief of Staff for Primary Care Dr. Masozera to e-mail CQM Dr. Woods, Dr. Mishra, CO Duplichien, and others that before Plaintiff could start, Defendant needed Primary Source Verification of Plaintiff's license.

33. Dr. Mishra correctly pointed out that Defendant already had primary source verification by way of the Puerto Rican verification, re-recommended Plaintiff for verification and to start his employment. Dr. Mishra also asked what the real reason for the delay was.

34. On information and belief, Defendant was hesitant to hire Plaintiff because of the difficulty in obtaining or translating his Spanish language credentials, specifically because of his Hispanic/ Latino ethnicity and/ or because of Defendant's perception of Plaintiff as disabled or his record of impairment.

35. On January 11, 2018, Dr. Mishra forwarded CQM Dr. Woods, Ass. Chief of Staff for Primary Care Dr. Masozera, and CO Duplichien a letter signed by the President/ Director of the Puerto Rico Medical Discipline and Licensure Board confirming that Plaintiff's license was verified and he was compliant with all laws.

Dr. Mishra again requested Plaintiff be hired, citing a lack of sufficient staff at Defendant's HOSPITAL.

36. On January 12, 2018, CQM Dr. Woods, e-mailed Dr. Mishra to "cease and desist with such emails" as Plaintiff's offer was to be rescinded.

37. Interim Medical Center Director Dr. M. Christopher Saslo sent the order to "stand down from any recruitment/onboarding of the physician (Plaintiff)" citing a "national mandate to terminate anyone with a restricted/revoked license." Such a mandate, however, did not apply to Plaintiff as his license was neither restricted nor revoked, he was in good standing, and he had provided ample evidence to show that.

38. On January 22, 2018, Plaintiff called and spoke with CO Duplichien, requesting to know why the process was taking so long. Duplichien misrepresented what the Puerto Rican Licensing Authority had relayed about Plaintiff's standing, claiming that he was not in good standing due to not turning in continuing education credits. Defendant knew or should have known this was false as Defendant's employee, who had translated the Spanish explanation for Plaintiff's Puerto Rican License Status, showed that the non-renewal was due to Plaintiff moving to Florida. Plaintiff expressed concerns about the hiring process and that he thought CO Duplichien was not taking Plaintiff's application seriously.

9

39. That next day, CO Duplichien apparently created a report against Plaintiff for implying that Duplichien was incompetent in his handling of Plaintiff's application and interpretation of Defendant's policy.

40. Defendant requested Plaintiff renew his Puerto Rico License and obtain a certificate of good standing to make sure there was no issues with his status, which he did. On February 9, 2018, it was approved. That day, Dr. Mishra e-mailed Dr. Reginald Labossiere for help getting Plaintiff hired, explaining Plaintiff's situation, that he had been waiting eleven (11) months and was understandably frustrated, that Defendant needed the open positions filled urgently, and that Plaintiff's license had never been revoked.

41. On February 12, 2018, the Associate Chief of Staff for Ambulatory Care and Chief Medical Officer fired/refused to hire Plaintiff when Defendant rescinded its job offer for the position of Physician.

42. Upon information and belief, Defendant replaced Plaintiff and/or hired a person who is not Hispanic/Latino, who is not disabled, nor does Defendant perceive the replacement/hire as disabled nor does the replacement/hire have a record of having an impairment.

43. Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendant should be made to pay said fee under the statutes referenced above.

## COUNT I
## RACE/ETHNICITY/NATIONAL ORIGIN DISCRIMINATION

44. Paragraphs 1 through 43 are re-alleged and incorporated herein by reference.

45. This is an action against Defendant for discrimination based upon race/national origin brought under 42 U.S.C. §2000e et seq.

46. Plaintiff has been the victim of discrimination on the basis of his race/ethnicity and/or national origin in that he was treated differently than similarly situated non-Hispanic/Latino employees of Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of his race/ethnicity and/or national origin.

47. Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

48. Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

49. Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

50. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race/ethnicity-based nature and in violation of the laws set forth herein.

51. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's prospective employment with Defendant and he was not hired by Defendant.

52. The events set forth herein led, at least in part, to Defendant's refusal to hire Plaintiff and/or withdrawal of the offer to hire him.

53. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race/ethnicity/national origin in violation of 42 U.S.C. §2000e et seq.

54. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive/equitable relief.

## COUNT II
## DISABILITY DISCRIMINATION

55.     Paragraphs 1through 43 above are re-alleged and incorporated herein.

56.     This count sets forth a claim for discrimination on the basis of Plaintiff's actual or perceived mental or physical disability and/ or record of impairment.

57.     Plaintiff has been the victim of discrimination on the basis of actual or perceived disability and/or record of impairment. Plaintiff applied for a position with Defendant and he was denied the position due at least in part to his disability/perceived disability/record of having an impairment.  Plaintiff was treated differently than similarly situated employees who are non-disabled, not perceived as disabled, or do not have a comparable record of impairment to Plaintiff.

58.      Defendant is liable for the differential treatment and its refusal to hire Plaintiff, which adversely affected a term, condition, or privilege of Plaintiff's prospective employment with Defendant.

59.     Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

60. In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were disability/perceived disability-based and in violation of the laws set forth herein.

61. The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's prospective employment by Defendant. The events set forth herein led, at least in part, to the refusal to hire Plaintiff and/or the withdrawal of the offer to hire him.

62. Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon disability or perceived disability, under the laws cited herein.

63. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and likely will continue in to the future. Plaintiff is entitled to equitable/injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e) enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f) award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

       Respectfully submitted,

       <u>/s/ Marie A. Mattox</u>
       Marie A. Mattox [FBN 0739685]
       MARIE A. MATTOX, P.A.
       203 North Gadsden Street
       Tallahassee, FL 32301
       Telephone:  (850) 383-4800
       Facsimile:   (850) 383-4801

       ATTORNEYS FOR PLAINTIFF